## Lucinda Johnson *v.* Mary S. Farley.

To constitute a valid delivery of a deed, it must pass into the hands of the grantee, or some one for him, in such way as to be beyond the legal control of the grantor; and, therefore, if placed in the hands of a third person to be by him delivered to the grantee, it will not be good against an intervening attachment of the land.

Where a deed of land is delivered to a third person for the use of the grantee, his assent will not be presumed unless it be clearly beneficial to him; and, therefore, if the deed conveys all of a debtor's real estate as security for the debts of forty different persons, and at the same time all the rest of the debtor's property is conveyed as security for other creditors, but not in the manner prescribed by the laws regulating assignments, the assent of the grantees in such deed will not be presumed.

VOL. XLV.     33

WRIT OF ENTRY, dated May 20, 1863, for two tracts of land in Hol lis, which are particularly described in the writ.

Plea, *nul disseizin.*

The plaintiff claimed under a mortgage from Edward Emerson to herself and 45 others, dated Dec. 28, 1860, and recorded at 8 o'clock and 48 minutes in the forenoon of the same day. The mortgage covered 23 separate tracts of land in this county, mostly in Hollis, and included the two tracts demanded, which were described in the mortgage by reference to the deeds under which Emerson derived his title, without other description.

The mortgage deed recited that $15,000 had been received from the 46 persons named as grantees, and purported to convey the premises to the same 46 persons, to have and to hold to said grantees, their heirs and assigns, for their own use forever, in the same proportions which the several sums thereinafter mentioned bore to each other.

The condition of the mortgage was to pay 37 of the 46 persons named in the deed as grantees, the several sums set down in the condition as payable to them respectively, and among them to pay the plaintiff $370, and also to pay two other persons, not before mentioned in the deed, two several sums set down as payable to them respectively. The condition provided that these sums should be applied to notes held by said grantees against the mortgagor, and the deed contained no other description of the debts purporting to be secured. Nine of the 46 persons named as grantees, had no debts secured, or mentioned in mortgage. The mortgage deed aforesaid is to be made part of this case.

The plaintiff produced on trial, a note for $370, dated July 10, 1858, payable to her or order, on demand, with interest annually, signed by Edward Emerson, on which was an endorsement of $30, under date of January 10, 1860. This note was admitted to be for a just debt, due from Edward Emerson to the plaintiff.

To prove the execution and delivery of the mortgage deed, the plaintiff introduced Benjamin F. Emerson as a witness, who testified that Edward Emerson was his brother; that he, the witness, and his son, E. R. Emerson, signed their names as witnesses to the deed; that Edward Emerson signed the deed and acknowledged it before him as a justice of the peace, and left it in his hands and requested him to put it on record for the grantees, and he did so; that, after the deed was recorded, the register returned it to him, and he thought he delivered it over to Leonard Jewett, one of the grantees, but was not positive; that he knew Leonard Jewett had it soon afterwards.

On cross examination, Mr. Emerson testified as follows:

No one of the grantees was present when the mortgage deed was signed and left with me. On Tuesday, the 25th day of December, 1860, my brother came to me at Nashua, and then, for the first time, spoke of his pecuniary difficulties; until then, I had supposed he was in good circumstances. He told me he was unable to pay his debts. He said he wished to secure his creditors as far as he could. The plan which was followed for the distribution of his property among his creditors, was

devised by him, not by me. I should have recommended a different course. The mortgage to me was written on Tuesday. On Wednesday, my brother went to Amherst to see where I had signed probate bonds for him. I did not see him on Wednesday. On Tuesday, he inquired of me whether more than one creditor could be secured by one mortgage. He made a mortgage of his household furniture to me, and provided for two or three of his creditors by separate mortgages of real estate. He left a good many notes with me endorsed, to be delivered as collateral security to certain of his creditors, whom he designated. His intention was to include in the arrangement all his property in New England. He made a separate mortgage of his land in Massachusetts, and another of his land in Washington, Sullivan County.

He had with him a list of his creditors in a book, covering two or three pages. He said there were a few small creditors, whom he hoped to provide for in some other way. He directed me to make writs in favor of eight of his creditors whom he named, and have his stock and all his personal property not mortgaged to me attached on the writs. I made the writs accordingly, on Friday, the 28th, and delivered them to the officer for service on Friday or Saturday. I think the attachments were not made till Saturday. The attachments were made according to my brother's direction. The amount of the debts, sued by his direction, was about $2000.

This business was transacted by my brother on the 27th of December, and in the night of that day and before he left on the morning of the 28th. I parted from him that morning about 7 o'clock, and he has not returned to this State since, though he has been in Massachusetts. I am not aware that he carried away with him any property, except money enough for his travelling expenses. No one was present when this business was done by my brother, except me and my son.

Edward provided for me, Saunderson, and some others, by separate mortgages; for some of the other creditors, by notes endorsed and left with me; for others, by attachment of his personal property on writs made by me according to his direction; and for the rest, by the general mortgage. There were some small creditors not included, whom he said he hoped to secure some other way.

I was absent at Lowell, on Saturday, the 29th of December, and on my return in the evening, I found Thomas Proctor waiting for me at my office. He was acting for Miss Farley, the defendant, and Mrs. Pierce. He wished to obtain security for them. I told him of this mortgage. He said he would have some writs made, take an officer with him to Hollis, and determine, after consultation, whether the writs should be served. I made him writs in favor of Miss Farley and Mrs. Pierce.

The mortgage deed to me was written on Tuesday, and those to Saunderson, Ames, and Smith, on Thursday. This mortgage was written on Thursday night. This mortgage deed with some others came back to me from the registry. I cannot tell the exact time. I gave no order to have them returned to me.

I afterwards brought several suits for creditors of my brother, which

were served by attachment of land covered by this mortgage. I was not able to point out to them any property of my brother, that could be taken for his debts, except what was covered by the mortgages, assignments and attachments, which had been made by him and by his direction, as I have stated. All, I made writs for, were told they were secured in this mortgage.

On direct examination resumed, Mr. Emerson testified as follows:

I was on my brother's probate bond to the amount of something like $3,000, and was surety for him on two notes for about $900. I informed Proctor, when he came to me for Miss Farley, of the mortgage, and that I had put it on record.

My brother proposed to secure his creditors as far as he could. He intended to prefer in giving the security, first, to those who were his sureties on bonds and notes, Ames, Smith and myself, and also Mr. Saunderson, in preference to others; then to secure certain others by notes and mortgages endorsed over, and by the attachment and mortgage of his personal property; and the rest, by this mortgage in proportion to their debts. He at the same time made a mortgage of his land in Washington to Betsey Jewett. I wrote the mortgage to Betsey Jewett.

Joel Hardy, a witness for the plaintiff, testified that he saw this mortgage in her hands in February or March, 1861. No other witness was examined for the plaintiff.

It appeared, by the memorandum of the register on his book of records, that this mortgage and several others were delivered out from the registry and sent to Mr. B. F. Emerson, on the 5th of January, 1861, and it was agreed that this memorandum should be received as evidence of that fact.

The defendant claimed title under an attachment made on the writ in her suit against Edward Emerson on the 29th day of December, 1860, at 2 minutes past 11 o'clock in the afternoon; a judgment recovered in that suit, September 21, 1861, for $1,712.70 debt, and $13.03 costs, and a levy of the execution issued on that judgment, made on one of the tracts described in the plaintiff's writ, October 14, 1861, on the other, October 16, 1861. No objection was made to the levy. This judgment was recovered for a note of Edward Emerson, payable to Thomas Proctor or order, and endorsed, on which was due, the sum of $128.68, and for a note of Edward Emerson, payable to the defendant or order, on which was due, the sum of $1684.02; and it was admitted that these notes were for just debts, due from Edward Emerson respectively to Proctor and the defendant at the time this mortgage was executed.

The cause was taken from the jury by consent, and the questions arising on the foregoing case are reserved for the consideration of the Court at the Law Term thereof.

BELLOWS, J. The evidence reported tends to show that the debtor,

Edward Emerson, being desirous of making security for his creditors, undertook to do so by causing attachments of property to be made in behalf of some of the creditors; by separate mortgages to others which he wished to prefer; and by a general mortgage of sundry other parcels of real estate to forty-six grantees, thirty-seven of whom were creditors whose several debts, with those of a few others not named as grantees, were attempted to be secured by such mortgage : that his purpose was to include in this arrangement all his property in New Hampshire, and to provide for all but a few small creditors whom he hoped to provide for in some other way : that these suits were brought and the mortgages made by his brother, Benjamin F. Emerson, and the one in question executed and left by the grantor in the hands of the said Benjamin, who was requested to put it on record for the grantees; and that he did so, and, after the mortgage was recorded, it was returned by the register to the said Benjamin, although it does not appear that any order to do so was given : that the mortgage was afterwards found in the hands of the plaintiff, one of the grantees, but before that period and before any act of assent by any of the grantees, the defendant, who also was one of the grantees in the general mortgage, had attached two parcels of the land so mortgaged, and afterwards obtained judgment in her suit against the said Edward, and extended her execution upon that land.

Upon this state of facts two questions arise :

1. Whether the deed was delivered to any one for the use of the grantees.

2. If so, whether there was an acceptance or assent by the grantees, presumed or otherwise.

As to the first point, it would seem to be clear, that, to constitute a valid delivery of a deed, it must pass into the hands of the grantee, or some one for him, in such way as to be beyond the legal control of the grantor. If merely placed in the hands of a third person to be by him delivered to the grantee, it is obvious that the grantor might at any time before the deed was actually delivered countermand the order and prevent its taking effect. This is the doctrine of *Bank* v. *Webster & al.* 44 N. H. 268, and the cases cited.

If in any case there could be a valid delivery to a third person for the use of the grantee, when such grantee had no knowledge of it, and had given such third person no actual authority to receive it, it must be in cases where the law will pronounce the conveyance to be clearly beneficial to the grantee, and therefore presume his assent to it; or, as in cases of assignments in New Hampshire, executed strictly according to the provisions of our statutes, under which the assent of creditors will be implied. But to give effect to such delivery when the assent of the grantee may be presumed from the beneficial nature of the conveyance, it must be placed beyond the control of the grantor, and not put into the hands of a third person merely to be delivered to the grantee, for then such third person is merely the agent of the grantor, who, at any time before actual delivery to the grantee, may recall it; but it must be de-

livered to such third person as the agent of the grantee, and received by him in that capacity, and then, if the law will, from the beneficial nature of the conveyance, presume the assent of the grantee, the delivery is complete and the estate passes at once.

There are cases where, upon this ground, such assent has been presumed. Among them are *Brooks* v. *Marbury*, 11 Wheat. 96 to 98 ; *Tompkins* v. *Wheeler*, 16 Pet. 113 ; *Doe* v. *Knight*, 5 B. & C. 672 ; *Grove, appellant* v. *Brien & al.*, 8 How. U. S. 429 ; *Merrills* v. *Swift*, 18 Conn. 257 ; *Woodward & als.*, v. *Camp*, 22 Conn. 461 ; *Jackson* v. *Bodle*, 20 Johns. 184. In some of these cases it has been held that sending to the registry, to be recorded, a deed clearly beneficial to the grantee, is a good delivery ; but the law is otherwise in New Hampshire, unless the register receive it as agent of the grantee. *Barns* v. *Hatch*, 3 N. H. 304 ; *Derry Bank* v. *Webster*, 44 N. H. 268, and cases cited.

In the case before us, there was no such delivery, and, for aught we can see, the deed remained entirely within the control of the grantor until after the attachment by the defendant, and therefore did not take effect as against her, *Cook* v. *Brown*, 34 N. H. 460, and the subsequent assent could not defeat the rights acquired by the intervening attachment. *Bank* v. *Webster*, 44 N. H. 269, and cases cited. This case, in fact, stands much upon the same footing as *Wheeler* v. *Emerson & Tr.* 44 N. H. 186, which apparently arose out of the same general transaction, and the doctrine of that case, in respect to the delivery of the promissory notes placed in the trustee's hands, applies equally to this case.

Had Mr. Benjamin F. Emerson, in the case before us, assumed to act as the agent of the mortgagees, and to have accepted the delivery of the mortgage in that capacity, still the law could not regard the conveyance as so clearly beneficial to the grantees that their assent would be presumed. In the first place, the mortgage was designed to secure about forty different creditors ; and, to presume the assent of each, it must be assumed that he would be disposed to relinquish the opportunity of obtaining a preference by attachment, and thus securing his whole claim. In this respect it stands upon a footing widely different from the case of a mortgage to a single creditor, as in *Merrills* v. *Swift*, 18 Conn. 257, before cited, or the case of *Brooks* v. *Marbury*, 11 Wheat. 96, where a deed was made to a third person in trust for the payment of certain preferred creditors who held paper with endorsements forged by the assignor, and the residue to be applied to the payment of the creditors generally. The fund here was not sufficient to pay the preferred creditors, and the court say nothing of the creditors of the second class ; but say that unwillingness to receive security cannot be gratuitously ascribed to the holders of forged notes.

Again, in the case before us, the debtor undertook at one and the same time to convey all his property in this State for the benefit of his creditors generally, giving preference to some and making no provision whatever for others, and, although these conveyances did not take the *form* of an assignment, yet, to say the least, it may be regarded as questionable whether they do not come within the mischiefs designed to be rem-

edied by our legislation upon that subject; and in determining what is or is not clearly beneficial to the grantee, it is not necessary to consider alone the particular conveyance in question, but the nature and circumstances of the entire transaction may be considered. *Camp* v. *Camp*, 5 Conn. 291. At all events, we do not conceive that such conveyances can be regarded as so clearly valid that the law would presume the assent of creditors to them.

Upon the whole, we think this is not a case where the conveyance is so clearly beneficial to the grantees that their assent would be presumed. The cases on this subject are referred to in *Bank* v. *Webster*, 44 N. H. 269.

Upon these views, there must be judgment for the defendant, unless the plaintiff desires farther proceedings, and if so,

*The case must be discharged.*